**Frank G. McALEESE, Appellant at No. 92–1820,**

v.

**J.F. MAZURKIEWICZ, Warden; Attorney General of the State of Pennsylvania; District Attorney for Philadelphia County, J.F. Mazurkiewicz, Appellant at No. 92–1718.**

Nos. 92–1718, 92–1820.

United States Court of Appeals, Third Circuit.

Argued April 27, 1993.

Decided July 27, 1993.

Stephen D. Ellis (argued), Richard L. Scheff, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for appellant Frank G. McAleese.

Donna G. Zucker (argued), Chief, Federal Litigation, Ronald Eisenberg, Deputy Dist. Atty., Law Div., Arnold H. Gordon, Chief Deputy Dist. Atty., Lynne Abraham, Dist. Atty., Philadelphia, PA, for appellant Joseph Mazurkiewicz.

Before: BECKER, HUTCHINSON and WEIS, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Appellants are John F. Mazurkiewicz, Superintendent of the State Correctional Institute at Rockview, Ernest D. Preate, Jr., Attorney General of Pennsylvania, and Lynne Abraham, District Attorney of Philadelphia County (collectively the "Commonwealth"). They appeal an order of the United States District Court for the Eastern District of Pennsylvania granting a writ of habeas corpus to appellee Frank G. McAleese because his counsel was ineffective. The district court had subject matter jurisdiction under 28 U.S.C.A. § 2254 (West 1977). This Court has appellate jurisdiction under 28 U.S.C.A. §§ 1291 (West Supp.1993) and 2253 (West 1971). After careful consideration, we have concluded McAleese's trial counsel was not constitutionally ineffective under the standards set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, we will reverse.

### I. *Procedural History*

On June 17, 1983, following a jury trial in the Philadelphia Court of Common Pleas, McAleese was convicted of third degree murder and possession of an instrument of crime in the killing of his ex-wife, Ramona Grabowski. McAleese retained a new lawyer postverdict, who raised claims of ineffective assistance of counsel and trial error. Following

lengthy evidentiary hearings, during the course of which McAleese's second retained counsel withdrew and court-appointed counsel was provided, the court of common pleas denied post-verdict relief and sentenced McAleese to ten to twenty years imprisonment for murder, and a consecutive 2.5 to five years for the weapons offense.

McAleese appealed directly to the Pennsylvania Superior Court, which affirmed. *See Commonwealth v. McAleese,* 371 Pa.Super. 645, 534 A.2d 132 (1987) (unpublished mem. op.). The Supreme Court of Pennsylvania allowed an appeal limited to the issue whether trial counsel was ineffective in presenting an alibi defense. After briefing and argument, however, the supreme court dismissed the appeal as improvidently granted. *See Commonwealth v. McAleese,* 520 Pa. 92, 552 A.2d 667 (1989).

On March 27, 1989, McAleese filed a petition for a writ of habeas corpus in the district court.[1] The magistrate judge to whom the district court assigned the case for a report and recommendation appointed counsel to represent McAleese in his quest for federal habeas relief.

On March 18, 1992, the magistrate judge issued a report and recommendation rejecting six of the seven claims McAleese had raised in his petition, but recommending that the writ be granted on McAleese's Sixth Amendment claim that trial counsel was ineffective. The magistrate judge concluded that trial counsel's investigation of facts that might have supported McAleese's alibi defense was inadequate because counsel made no effort to obtain telephone records that were available for only a thirty to sixty-day period. McAleese claims that these records would have shown an absence of long distance calls placed about the time of the murder to the Wilmington office of James Natalie, Jr., Esq., a Delaware lawyer who was then representing McAleese in unrelated

---

1. McAleese filed an earlier petition for writ of habeas corpus in the district court before the conclusion of the post-verdict proceedings in state court. The district court dismissed it for failure to exhaust state remedies. *See McAleese v. Dukes,* Civ.A. No. 86–4370 (E.D.Pa. Jan. 9, 1987). This Court denied a certificate of probable cause to appeal on March 25, 1987. *See McAleese v. Dukes,* No. 87–1036 (3d Cir. Mar. 25, 1987).

criminal insurance fraud proceedings in Delaware.

McAleese's claim that trial counsel departed from *Strickland*'s objective standard of reasonableness when he failed to check the long distance records warrants separate discussion. McAleese claimed that he had telephoned Natalie at about 3:00 p.m. on the afternoon of the murder, close to the time it apparently was committed. Natalie likewise represented to trial counsel that he had received a phone call from McAleese at about that time, and that McAleese had not reversed the charges.[2] The magistrate judge reasoned that the telephone records could have shown that no long distance telephone calls were made to Natalie's Wilmington office from Philadelphia at or around 3:00 p.m., the approximate time the crime was committed; and, if so, that a jury could have inferred McAleese was in or near Wilmington at the time the crime was being committed in Philadelphia. Despite the present unavailability of the phone records and the consequent absence of any direct evidence of what they would show, the magistrate judge apparently inferred they would support McAleese's alibi from evidence that showed he was in Wilmington at other times on the day of the crime even though those other times would not rule out his presence in Philadelphia at the time the crime was committed. The magistrate judge then went on to conclude that trial counsel's failure even to attempt to retrieve the records was inexcusable and so did not meet the objective standard of competence under *Strickland.*

Alternately, the magistrate judge determined that trial counsel had promised the jury in his opening statement that he would present an alibi defense, and then unreasonably failed to do so by not calling Natalie as a witness to establish McAleese's whereabouts at the time of the murder. The magistrate judge concluded that this mishandling of the defense likewise constituted ineffectiveness and undermined the reliability of the jury's verdict. Therefore, he recommended the writ be granted unless the Commonwealth granted McAleese a new trial. *See McAleese v. Mazurkiewicz,* Civ.A. No. 89–2151 (E.D.Pa. Mar. 18, 1992) (*hereinafter* "Report and Recommendation"); Appendix ("App.") at 1289–1327. The Commonwealth filed objections to the report and, after McAleese responded, the district court approved and adopted the report and recommendation and, on June 17, 1992, issued an order granting the writ unless the Commonwealth cured the constitutional error by retrying McAleese within 180 days.

McAleese filed a motion to alter or amend the June 17 order to shorten the time within which retrial would be allowed. Before the district court had ruled on McAleese's motion, the Commonwealth filed a notice of appeal from the June 17, 1992 order of the district court granting McAleese's petition for writ of habeas corpus. The district court denied the motion to alter or amend because of the pending appeal. On July 28, 1992, this Court dismissed the Commonwealth's appeal, with the agreement of the parties, as premature under Federal Rule of Appellate Procedure 4(a)(4). *See McAleese v. Mazurkiewicz,* No. 92–1579 (3d Cir. July 28, 1992). At that point, McAleese renewed his motion to alter or amend and filed a motion for enlargement, *i.e.,* release from prison pending decision on his appeal. The Commonwealth responded by filing a motion to stay issuance of the writ pending appeal. On August 18, 1992, after hearing argument, the district court vacated its earlier order and granted McAleese's motion to alter or amend the judgment by allowing the Commonwealth 120 days in which to retry McAleese instead of the 180 days for retrial provided by the original order. Simultaneously the court granted the Commonwealth's motion for a stay pending appeal and denied McAleese's motion for enlargement on bail. The Commonwealth then filed a timely notice of appeal in this Court.[3]

---

**2.** Natalie also did not think that McAleese had placed the call from a pay phone because he did not hear the sounds of coins being dropped in a box.

**3.** On September 1, 1992, McAleese filed a motion in the district court for reconsideration of the order denying enlargement pending appeal. The district court denied reconsideration on September 15. McAleese filed a timely notice of appeal in this Court on October 1. It was docketed as a cross-appeal. Shortly thereafter, McAleese filed a motion for enlargement and/or bail in this

## II. *Statement of Facts*

Ramona Grabowski was brutally murdered between 2:30 and 3:00 on the afternoon of December 1, 1982. The murder took place in the basement of her residence on Hawthorne Street in northeast Philadelphia. A post mortem examination revealed that Grabowski had suffered forty anterior stab wounds to the head, neck, trunk, and extremities, as well as anterior fractures of the skull with incised wounds to the brain, and laceration of her lower lip, both nipples, and the right labia. Her injuries also included cuts or wounds to her forehead, nose, right eyebrow, neck, and chin. Fourteen small wounds distributed over Grabowski's back were caused by the knife or weapon that had inflicted the wounds on the front of her body completely passing through her.

At trial, the Commonwealth's case-in-chief established that nine-year old Monica Hendricks, Grabowski's daughter by another marriage, arrived home from school on the date of the murder at about 3:00 p.m. Monica entered the house through the basement and went up the cellar steps to the first floor. There she encountered her younger siblings, Tanya, Rebecca, and Joseph. They were screaming. Monica went back down to the basement. Seeing nothing, she returned to the kitchen. On her way back to the kitchen she looked out a window and saw a green car with stripes down its side and a luggage rack on its roof.

Entreated by her younger sisters and brother, Monica returned to the basement where she saw a man walking out of the door. She described him as fat with gray hair, a mustache, blue eyes, no bottom teeth, and bumps on his face. She said that he was wearing a tan jacket and trousers of a darker brown. Monica testified at trial that he mumbled something as he walked out of the basement door. Later she identified McAleese as the man she had seen in the basement. After he left, Monica saw her mother lying in a corner of the basement, stabbed, with clothing stained and in disarray.

Monica ran for help and encountered her school's crossing guards. She did not at once tell the crossing guards why she needed help because she wanted to talk to her eleven-year old stepsister, Tara, first. When Tara arrived, Monica talked to her. Tara then told Mary Wijtyszyn, one of the crossing guards, that Monica said her mother had been stabbed.

Mary Wijtyszyn and another crossing guard, Harriet Hughes, went with Monica and Tara to their house. Mary Wijtyszyn testified that Monica said the man she saw in the basement was big with missing front teeth and some gray hair. Monica also said that she thought the man was Tanya's and Rebecca's father.[4] Later Monica told Mary Wijtyszyn that "the man she had seen was Frank McAleese, Tanya and Rebecca's father." App. at 306. At the Grabowski residence, Monica also told Harriet Hughes that McAleese was the man she saw in the basement.

Later, during the evening of December 1, as Detective Roy Gibson of the Philadelphia Police Department was taking Monica to her grandmother's home, she pointed out a white Ford Fairmount station wagon and, according to Detective Gibson, said that except for its color and the absence of a luggage rack and stripes on the side the car was the same as the one she had seen earlier that day. Then she spotted a car with a luggage rack identical to the one she had seen on the car outside her residence that afternoon and pointed it out. Detective Gibson, accompa-

Court. We denied it on October 19, 1992. McAleese agrees with the Commonwealth that his cross-appeal from the district court's denial of his motion for reconsideration was thereby rendered moot. He nevertheless urges this Court to grant enlargement under Federal Rule of Appellate Procedure 23 concurrently with affirmance of the district court's grant of habeas corpus relief. In view of our disposition, we will deny that request.

4. At the time of the murder in December 1982, Tanya was five years old and Rebecca was three. In his amended complaint for divorce from Ramona Grabowski, the victim, McAleese stated that there were no children born of the marriage. Thus, McAleese disavows paternity of either. *See* Brief for Appellee at 12. The Commonwealth introduced evidence at trial that McAleese and Grabowski had been married on June 24, 1977 and divorced on October 1, 1979, *see* trial record, Exhibit C–43.

nied by Detective Bittenbender, located McAleese's automobile in Delaware parked in a lot next to his apartment. It was a green station wagon with off-white stripes and matched Monica's description of the car she had seen outside her home that afternoon.[5]

A search of McAleese's apartment produced a knife with a brown wooden handle and metal blade. It was chemically analyzed and tested negative for human blood but positive for beef blood. In addition, a beige shirt and brown trousers were found in the washing machine, still wet, together with other clothes, including those of a child. The shirt and trousers were analyzed. They too tested negative for human blood. Monica testified at trial that the shirt looked like the one worn by the man whom she had identified as McAleese.

Edgar Turner, an employee of Bell Telephone Company, testified from his company's records that a five-minute telephone call was placed from McAleese's place of business in Wilmington, Delaware to Grabowski's residence at 1:10 p.m. on the date of the murder. Over the objection of McAleese's trial counsel, the Commonwealth produced the testimony of witnesses Darleen Wetton and Regina Boyle, both of whom stated that Grabowski had told them during telephone conversations on the date of the murder that McAleese planned to visit her that day and bring her some watches to sell.

More specifically, Wetton testified that she had a telephone conversation with Grabowski between 1:15 p.m. and 1:45 p.m. on the day of the murder. During that conversation, Grabowski told her that Tanya's father had telephoned her earlier that day. Grabowski referred to the caller as her ex-husband, but did not call him by name. Wetton estimated that Grabowski had approximately four or five ex-husbands, not including Al Grabowski, the man to whom she was married on the day she died.

Boyle testified that she had two "very long" telephone conversations with Grabowski on the day of the murder. The first call was at either 10:00 a.m. or 11:00 a.m. The second call was "around" 1:00 p.m. Grabowski told Boyle that Frank McAleese, her ex-husband, was "coming down to bring her some watches, and he was going to [meet] her at the 7–11" at three o'clock. App. at 248. Boyle said that the telephone conversation lasted until 2:30 p.m. without any significant interruptions. During the conversation, Grabowski never said, " 'Wait a minute. I have to go to the door,' or, 'Somebody is at the door,' or anything like that." Id. at 257. Instead, Boyle testified that at 2:30 p.m. Grabowski "sounded very scary, and she hung up very quickly." Id.

Without testifying himself, McAleese put on a three-pronged defense. He attacked the identification testimony of the sole eyewitness, nine-year old Monica Hendricks. He showed that he was an established businessman, that he was well-known as such among various tradespeople in Delaware, and that he was something of an expert in his field, having published an article in a trade magazine, thus attempting to suggest that he was not the kind of man who would commit such a brutal murder. Finally, McAleese presented a "loose alibi" defense through the testimony of five disinterested witnesses. App. at 1287. Although this defense did not place him beyond the scene of the crime at the time of the murder, it did place him in Delaware at various times between 10:00 a.m. and 1:30 p.m. and again at 5:45 p.m. on the day of the murder. The defense's theory was that the loose alibi supported the evidence suggesting McAleese was not the type to commit a brutal murder because a violent murderer would be unlikely to go about his ordinary daily activities just before and after a killing as brutal as the killing of Ramona Grabowski. By this, together with some inconsistencies in Monica's story and dental records showing McAleese had all his teeth after the crime, the defense hoped to raise in the jury's mind a reasonable doubt about McAleese's identity as the killer.

---

**5.** A later examination of the automobile revealed a reddish brown stain above the door handle in the interior on the driver's side. Another reddish brown stain was found on the exterior door on the driver's side just below the door handle. Chemical analyses of the stains, as well as a floor mat and a vinyl portfolio taken from the automobile, tested negative for human blood.

Pursuing the loose alibi defense, trial counsel called five disinterested witnesses to the stand to testify about McAleese's whereabouts on the day of the murder. These witnesses were:

—Florence Lincoln, an employee of U.S. Optical in Wilmington, who testified that McAleese had been in the store at 10:03 a.m. on the date of the murder to drop off his daughter's or stepdaughter's eyeglasses;

—Mary DiGiacomo, who was employed by a hardware supply company and testified that she sold a dog house to McAleese between either 11:00 a.m. and noon or 12:30 p.m. and 1:00 p.m.;

—Alvin Hall, Jr., then vice-president of General Engineering Supply Company of Wilmington, Delaware, who testified that he had a telephone conversation with McAleese between 10:00 a.m. and noon on December 1, and that McAleese also came to his office that same day between noon and 1:30 p.m.;

—Tracy B. Sharp, a counterman at Greenberg Supply, who testified that he remembered McAleese being in the store on December 1 between noon and 1:30 p.m.; and

—Dorothy Martinez, custodian of records for a physical therapist in Wilmington, who testified that McAleese kept a 5:45 p.m. appointment on December 1.

The loose alibi defense was originally to include the testimony of attorney Natalie, McAleese's Wilmington lawyer in the unrelated criminal fraud case. Natalie would have testified that he had spoken to McAleese on the telephone shortly before 3:00 p.m. on the day of the crime.[6] Before counsel called Natalie to the stand, he sought a ruling from the trial court that would have restricted cross-examination of Natalie to whether the phone call had in fact occurred. The trial court refused so to limit Natalie's cross-examination and ruled instead that if Natalie testified, he would be subject to cross-examination about the substance of his conversation with McAleese. Trial counsel did not challenge this ruling by informing the court that the substance of the conversation involved pending unrelated Delaware criminal charges against McAleese. Ultimately, trial counsel decided not to call Natalie as a witness.[7]

### III. *Issues on Appeal*

The Commonwealth argues that McAleese's trial counsel was not constitutionally ineffective under the standard set forth in *Strickland v. Washington*, 466 U.S. at 668, 104 S.Ct. at 2052. Specifically, the Commonwealth argues that trial counsel's decision not to call Natalie as a witness was a reasonable choice of strategy in light of the trial court's refusal to limit the scope of cross-examination of Natalie's telephone conversation with McAleese, a conversation in which Natalie and McAleese discussed unrelated pending criminal charges against McAleese. The Commonwealth also argues that trial counsel's failure to seek Natalie's phone records of incoming calls on the afternoon of the

---

**6.** Of course, Natalie could not have testified regarding the point of origin of McAleese's call.

**7.** Natalie also would have testified that he had received a phone message regarding a call from McAleese at 8:33 a.m.

At the post-verdict evidentiary hearing, Natalie testified that he dictated a memo of his phone conversation with McAleese within a half hour of the 3:00 p.m. phone call. In that memo he noted that McAleese had called "twice during the afternoon" and that he finally had spoken to him shortly before 3:00 p.m. Natalie identified photocopies of two phone message slips taken by his secretary from a person identifying himself as Frank McAleese. One showed a call at 8:33 a.m. and one showed a call at 2:38 p.m.

McAleese's trial counsel, on the other hand, testified that he had been provided with only *one* phone message slip—the one showing a call at 8:33 a.m. He also testified, however, that his investigator had spoken to a secretary in Natalie's office who said she had taken a call from someone identifying himself as Frank McAleese at around 3:00 p.m. in the afternoon. She said the caller hung up before completely spelling his name, and that she had noted the call on a piece of scrap paper, not a phone message slip of the sort Natalie produced for McAleese at the post-verdict hearing. When trial counsel interviewed her, the piece of scrap paper no longer existed and she was unable to provide him with it. In examining the photocopied message slip of the purported 2:38 p.m. phone call at the post-verdict evidentiary hearing, trial counsel opined that it looked like a doctored version of the 8:33 a.m. message.

murder did not render his performance constitutionally deficient.

Ineffective assistance of counsel claims are mixed questions of law and fact. *Id.* at 698, 104 S.Ct. at 2070; *Reese v. Fulcomer,* 946 F.2d 247, 253 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992). We subject the legal component to plenary review. *Reese,* 946 F.2d at 253. Our scope of review over the factual elements depend on their origin. While a state court's conclusion that counsel rendered effective assistance is not a finding of fact subject to deference by a federal court, *Reese,* 946 F.2d at 254 (quoting *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070), state court findings of historical fact made in the course of deciding an ineffectiveness claim are presumptively correct if they meet the requirements of 28 U.S.C.A. § 2254(d) (West 1977), *see Ahmad v. Redman,* 782 F.2d 409, 411–12 (3d Cir.), *cert. denied,* 479 U.S. 831, 107 S.Ct. 119, 93 L.Ed.2d 66 (1986). In addition, when, as in the present case, the district court did not hold an evidentiary hearing and engage in independent fact finding, and the habeas evidence is limited to that contained in the state court record, our review of a district court's decision to grant the habeas corpus petition is plenary. *Lesko v. Owens,* 881 F.2d 44, 50–51 (3d Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990); *see Hakeem v. Beyer,* 990 F.2d 750, 758 (3d Cir.1993) (because district court never conducted evidentiary hearing, appellate court exercises *de novo* review over factual inferences district court drew from state record).

## IV. *Discussion*

The Sixth Amendment right to counsel encompasses the right to effective assistance of counsel. *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2063–64. A claim of ineffective assistance requires a defendant to establish that counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. *Id.* at 687–88, 104 S.Ct. at 2064–65. In order to demonstrate prejudice, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.* Stated differently, there will be no award of relief unless the defendant affirmatively establishes the likelihood of an unreliable verdict. *See id.* at 688–89, 691, 694, 104 S.Ct. at 2064–65, 2066–67, 2068. Keeping these standards in mind, we turn to the Commonwealth's allegations of error.

### A. *Counsel's Decision Not to Call Natalie as a Witness*

#### 1. *The Opening Statement*

Preliminarily, we note the district court, in adopting the magistrate judge's report and recommendation, found that McAleese's trial counsel promised the jury an alibi defense in his opening statement, and that Natalie's testimony that McAleese had telephoned him at approximately 3:00 p.m. on the day of the murder was the cornerstone of that defense. When counsel failed to call Natalie as a witness, the magistrate judge reasoned, the alibi defense became completely untenable. The Commonwealth contends trial counsel never made any such promise.

The failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel. *See, e.g., Harris v. Reed,* 894 F.2d 871, 879 (7th Cir.1990) (Sixth Amendment violation where defense counsel failed to call witnesses who he claimed in opening statement would support defense version of shooting); *Anderson v. Butler,* 858 F.2d 16, 17–19 (1st Cir.1988) (Sixth Amendment violation where counsel failed to present promised expert medical testimony that defendant had acted without cognizance of, or feeling for, actions). The rationale for holding such a failure to produce promised evidence ineffective is that when counsel primes the jury to hear a different version of the events from what he ultimately presents, one may infer that reasonable jurors would think the witnesses to which counsel referred in his opening statement were unwilling or unable to deliver the

testimony he promised. *See Anderson*, 858 F.2d at 18.

To determine whether trial counsel made a promise to produce evidence that he did not fulfill, we turn to the text of his opening statement. The portion of defense counsel's opening statement on which the magistrate judge and the district court relied stated:

> We will show you [that] on the day of this crime, December 1st, '82, my client wasn't even in the City of Philadelphia.
>
> My client wasn't even in the State of Pennsylvania. He was in Delaware, where he lives; carrying on his daily activities, running a number of errands, going to a number of different stores for different things. We will show you what he did from the early part of the day throughout the late evening, and we will show you [that] throughout the morning he went throughout several stores, and we won't be bringing in witnesses who are friends of Mr. McAleese, who are acquaintances of his.
>
> \*     \*     \*     \*     \*     \*
>
> We will show that he '... went to the hardware store, bought a dog house there. *We will show you that he went to his house where he worked on some estimates.* We will show that he went to Greenberg Supply Company, where he had discussions with a number of people there, and they will testify that he was there in connection with his business, as I told you previously, Delaware Energy and Engineering Corporation, and that they know him as a business client there, and *they will tell you that he was there until sometime in the early afternoon, that he then went home, worked on various matters, plans estimates, and you will hear then at 5:45—excuse me—5:30 that evening, Mr. McAleese went to a previously scheduled appointment he had with a physical therapist, Frank Kushner, . . . .*

Report and Recommendation at 18–19; App. at 1306–07 (emphasis added by magistrate judge).

We see no promise by McAleese's counsel to produce Natalie's testimony or even to establish that McAleese was in Wilmington at the time of the murder. We do see a carefully worded recitation of evidence the defendant did produce. From it, counsel hoped to lead the jury into inferring from McAleese's activities in Wilmington on the day of the murder that there was a reasonable doubt about his presence in Philadelphia at the time and place the crime was committed, even though that evidence might not make impossible his presence at the crime scene when the crime was committed. Trial counsel did not refer to the precise time of the murder. He did not promise to provide witnesses who would testify that McAleese was elsewhere at the time of the murder. He did not promise any airtight alibi. He merely summarized evidence that was later produced from which a jury could be left with a reasonable doubt about McAleese's identity as his ex-wife's killer. Trial counsel did not promise the jurors that they would hear any evidence they did not. The district court erred in concluding that trial counsel failed to fulfill any promise he made to the jury in his opening statement.

### 2.  *The Decision Not to Call Natalie*

■  'The district court also held that trial counsel's failure to call Natalie constituted ineffectiveness. The Commonwealth argues, however, that counsel's mid-trial decision not to call Natalie was a reasoned, strategic decision made after considering the trial court's refusal to restrict cross-examination of Natalie, as well as counsel's assessment of the case at that point. *See* Brief for Appellants at 25; *see also United States ex rel. Johnson v. Johnson*, 531 F.2d 169, 177 n. 19 (3d Cir.) ("We do not intimate . . . that a lawyer of normal competence could not promise to produce evidence in his opening statement and then change his mind during the course of the trial and not produce the promised evidence."), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). Thus, even if we could imply into the opening a promise to establish McAleese's presence in Wilmington at the time of the murder by calling Natalie to testify about the 3:00 p.m. phone call, his later decision not to do so is not necessarily ineffective. Trial counsel testified in the state court post-trial proceedings that he did not call Natalie because he did not want the

jury to learn of the unrelated criminal charges pending against McAleese for fear that knowledge of them would destroy the image of McAleese as a businessman and father that he had attempted to create. The district court rejected this reason as "little more than a post hoc rationalization." Report and Recommendation at 29; App. at 1317.

■ This finding is not subject to limited, deferential review under the clearly erroneous standard because the district court made it on the basis of the state court record. *See Lesko*, 881 F.2d at 50–51, 51 n. 8. McAleese argues that no evidence was produced at trial from which the "model citizen" image counsel was trying to project could be inferred or suggested. We, however, see nothing in the record that would indicate trial counsel's proffered explanation for not calling Natalie was not a reasoned, strategic decision. The evidence the defense did produce had a tendency to support the image counsel sought to create—evidence to which he referred in his closing. For example, in his summation counsel described McAleese as "a workman, somebody who works on chimneys, works on boilers, heaters and air-conditioners." App. at 636. This description, based on evidence, supports the inference that McAleese was a hard-working member of the community. Trial counsel later bolstered that inference by further describing McAleese as "a man who we know is self-employed, who works out of his home address, works out of his home." *Id.* at 637. This description was also supported by evidence. The testimony of the five disinterested alibi witnesses painted a picture of McAleese as an ordinary citizen engaged in the affairs of everyday life: dropping off eyeglasses to be repaired, purchasing equipment for his business, buying a doghouse, and going to physical therapy. Any evidence of criminal charges pending against McAleese would. have instantly distinguished him from an average citizen.[8]

The jury's failure to embrace this image does not make counsel's efforts to support it, and avoid damaging evidence inconsistent with it, unreasonable.

Moreover, the district court's characterization of trial counsel's explanation as only "post hoc rationalization" is contrary to a finding implicit in the state trial court made in connection with its earlier ruling on McAleese's petition for post-conviction relief. *See Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983) ("federal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them"); *see also Ahmad*, 782 F.2d at 411–12 (state court findings of fact presumed correct if fairly supported by record). The trial court expressly determined that defense counsel

> as a matter of trial strategy decided, that in light of the court's evidentiary ruling, it would be unwise and damaging to defendant's image if the nature of the open criminal charges were made known to the jury. Viewed in the context of the entire defense, said decision was not unreasonable.

App. at 1367. The district court's determination that counsel's decision not to call Natalie was "post-hoc rationalization" instead of a reasoned, strategic decision is not supported by the record and is contrary to the state court's finding that it was. *See Hakeem*, 990 F.2d at 767–68 (presumption of correctness attaches to subsidiary or historical facts in speedy trial calculation).

■ The district court also held that counsel was objectively deficient in failing to apprise the trial court about the nature of the telephone conversation between McAleese and Natalie, and in failing to argue that it would be unfairly prejudicial to permit the Commonwealth to cross-examine Natalie on unrelated criminal charges that were never

---

8. McAleese contends the desired image was destroyed when two of the five alibi witnesses testified that McAleese had been drinking beer when they encountered him. Trial counsel suggested during summation that it is not "unusual for a working man to have a couple of beers during the course of the afternoon," and that this evidence was irrelevant to the question whether McAleese in fact committed the murder. App. at 638–39. Trial counsel's comments were a reasonable attempt to deal with evidence that could have had a negative impact on the jury's perception of his client but did not necessarily destroy the image the defense sought to project.

prosecuted. The trial judge specifically stated at the post trial hearing,

> [W]hile we are on this subject and again I want to make the record very clear it is my recollection that I merely ruled that if Mr. Natalie was questioned about these phone calls and he actually spoke on the phone with him, that that would open the door for cross-examination by the Commonwealth as to the substance of the conversation. *However, I also want to make it clear I did not know what the substance of the conversation was.* I did not know that it pertained to any prior crime or anything of that nature. I just ruled as a general proposition that where a party is called and testifies that a phone call was made, that that opens the door on the issue of credibility to cross-examination as to the content of the conversation.

App. at 979 (emphasis added). The district court emphasized the above language in determining that counsel should have informed the trial court of the substance of the phone call. *See* Report and Recommendation at 30 n. 12; App. at 131 n. 12.

The Commonwealth argues that counsel's failure to apprise the district court of the substance of the conversation was of no moment because "Pennsylvania law would have permitted the prosecutor to cross-examine Natalie about the substance of the phone conversation." Brief for Appellants at 30 (citing *Commonwealth v. Saxton*, 516 Pa. 196, 532 A.2d 352 (1987)). In *Saxton*, the defense had presented testimony that the police had not considered Saxton a suspect at the outset of the investigation. In rebuttal, the prosecution called as a witness a detective who made reference to the police department's possession of Saxton's photograph and fingerprints in order to establish that the police had in fact made a diligent effort to locate Saxton, using his photograph and prints as a starting point. Defense counsel did not object to the detective's testimony. 532 A.2d at 357. This could have enabled the jury to infer that Saxton had a prior criminal record. The Pennsylvania Supreme Court commented:

> Such testimony on behalf of the Commonwealth clearly did not violate the prohibition against referring to prior, unrelated offenses of an accused. Evidence of prior crimes, though generally inadmissible, may be admitted if relevant to prove something other than a defendant's propensity for committing crimes. *E.g., Commonwealth v. Claypool,* [508 Pa. 198] 495 A.2d 176 (1985); *Commonwealth v. Russell,* [459 Pa. 1] 326 A.2d 303 (1974). One exception to the general prohibition is that the Commonwealth may introduce evidence tending to show prior offenses if the purpose is to rebut statements which create inferences favorable to the accused. *Commonwealth v. Roots,* [452 Pa. 535] 306 A.2d 873 (1973). Therefore, under the "reasonable basis" test as outlined herein, it was appropriate for defense counsel to refrain from objecting to the detective's reference. Counsel is not ineffective for declining to make a meritless objection.

*Id.* (citations omitted).

*Saxton* is, however, distinguishable from the present situation. Here, there was no compelling reason to disclose the pending criminal charges that were the substance of McAleese's conversation with Natalie. At the least, it could have been strongly argued that under the circumstances the disclosure of these pending charges would have been more prejudicial than probative. If, for example, McAleese had taken the stand and testified that he had no criminal charges pending against him, it might be likely that the substance of his conversation with Natalie would have been relevant and admissible to rebut McAleese's credibility. McAleese, however, did not testify. Here, the disclosure of the pending insurance fraud charges against McAleese would have had no probative value in determining Natalie's credibility nor would it have had any logical tendency to prove or disprove Natalie's claim that the telephone call was made. Because disclosure of the charges would have been merely incidental to the Commonwealth's attack on Natalie's credibility, it would have fallen within the "prohibition against referring to prior, unrelated offenses of an accused." *Id.* As a general matter, that prohibition is recognized by Pennsylvania. *See id.*

The Commonwealth notes that the Pennsylvania Superior Court, in affirming McAleese's conviction, specifically found that the trial court did not err in its ruling, and that cross-examination of Natalie about the nature of the conversation would have been proper. *See* Brief for Appellant at 30. This decision, however, was not made in the context of a challenge by McAleese to the effectiveness of his counsel, but rather in an attack on the trial judge's ruling. The superior court held, "The trial judge cannot be faulted for denying a motion to limit cross-examination if he was not told what information was likely to be elicited." App. at 1343. The court continued:

> The scope of cross-examination is properly within the discretion of the trial judge and the cross-examiner must be afforded the necessary latitude to insure a fair trial. Cross-examination may be employed to test a witness' story, to establish his motive for testifying and to impeach his credibility. Appellant was presumed to have been familiar with these principles when he insisted that Natalie take the stand. He cannot now seek to present limited evidence on his own initiative and for his own purposes without allowing the Commonwealth full opportunity to explore this evidence.

*Id.* (citations omitted). Thus, the superior court held only that the trial court did not err in ruling, based on the information counsel made available to it, that the Commonwealth could cross-examine Natalie on the substance of his conversation with McAleese. This statement does not support the Commonwealth's argument that counsel was not ineffective in failing to inform the court of the substance of the conversation, because it was the trial court's lack of such knowledge that rendered its ruling correct.

Despite our rejection of the Commonwealth's primary arguments, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process

that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. Thus, in order to establish his counsel's deficiency, McAleese had to show that the failure to inform the trial court of the substance of his telephone conversation with Natalie was an "error[ ] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064.

Even if trial counsel had informed the court of common pleas of the substance of the conversation and had received a favorable ruling limiting cross-examination to whether the call in fact took place, trial counsel could have still reasonably decided it was best not to call Natalie to testify. Were Natalie, an attorney, to testify that he talked with McAleese about the time of the crime without disclosing the topic of his conversation, the jury could have speculated about that topic. If it did so, it might have concluded that McAleese had spoken to Natalie in connection with the murder. Simply put, calling Natalie as a witness may have been more damaging to McAleese's defense than not calling him. Because counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id.* at 690, 104 S.Ct. at 2066, we cannot hold his failure to inform the trial court of the substance of McAleese's telephone conversation with Natalie was "[un]reasonable considering all the circumstances," *id.* at 688, 104 S.Ct. at 2065, or "outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066.

Nevertheless, it remains possible, as noted above, that the prejudicial effect of disclosing the substance of McAleese's conversation with Natalie would have outweighed any probative effects of such disclosure. We will thus assume, without deciding, that trial counsel's failure to advise the court of the topic of the conversation rose to the level of a constitutionally deficient error. Indeed, this Court has "read *Strickland* as requiring the courts to decide first whether the assumed deficient conduct of counsel prejudiced the defendant." *United States v. Fulford*, 825

F.2d 3, 8 (3d Cir.1987); *see McNeil v. Cuyler*, 782 F.2d 443, 449–50 (3d Cir.), *cert. denied*, 479 U.S. 1010, 107 S.Ct. 654, 93 L.Ed.2d 709 (1986). *Strickland* itself recognized that

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the .ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

466 U.S. at 697, 104 S.Ct. at 2069; *see, e.g., Cuyler*, 782 F.2d at 451 (reversing order granting writ on grounds of no prejudice; while counsel's representation was assumed deficient, defendant received fair trial "even if his defense was flawed").

Thus, even assuming that trial counsel's failure to advise the court of the substance of McAleese's telephone conversation with Natalie fell below prevailing professional norms and thereby satisfied the first prong of the *Strickland* test, McAleese must still show that he was prejudiced by this failure. As *Strickland* recognized,

> Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense.

466 U.S. at 693, 104 S.Ct. at 2067.

Trial counsel conceded at McAleese's *Bighum* hearing[9] that Natalie could not have established where McAleese was at the precise time of the murder. Only McAleese could have done that. Moreover, Natalie could not have established where McAleese was calling from if he had testified, unless counsel had obtained the telephone records, which he did not.[10] Without those phone records, Natalie's testimony did no more than bolster McAleese's "loose alibi" theory that his normal, everyday activities are inconsistent with his alleged commission of the particularly heinous murder at issue. Because of the marginal utility of Natalie's testimony, counsel's failure to advise the trial court of the substance of Natalie's telephone conversation with McAleese did not "so undermine[ ] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 669, 104 S.Ct. at 2055.

### B. *The Telephone Records*

■ Finally, the magistrate judge determined McAleese's trial counsel was deficient in failing to investigate telephone company records to determine whether they showed any long distance phone calls to Natalie's office during the critical time period from 2:30 to 3:00 p.m. on the day of the murder, December 1, 1982. If they did not, McAleese contends, they would, when coupled with Natalie's testimony about a 3:00 p.m. phone call, strongly support his alibi defense. In December 1982, the telephone company retained records reflecting the origin of long distance, but not local, phone calls for thirty to sixty days. There is evidence that these records could have been subpoenaed within that period to determine whether Natalie received any long distance calls during the relevant time. Specifically, McAleese consulted trial counsel within that period and says he informed him of his phone calls to Natalie. The absence of any long distance calls about the time of the murder would have permitted the jury to infer that McAleese was not calling Natalie from Phila-

---

**9.** The purpose of a hearing under *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973), *as modified by Commonwealth v. Randall*, 515 Pa. 410, 528 A.2d 1326 (1987), is to determine whether the prosecution may cross-examine the defendant with evidence of his *crimen falsi* if he takes the stand, and also to forewarn the defendant that if he chooses to take the stand he may be impeached by prior *crimen falsi* convictions. *Commonwealth v. Ly*, 528 Pa. 523, 599 A.2d 613,

620 (1991). The trial court in the present case ruled that the Commonwealth would be permitted to impeach McAleese should he testify. Because McAleese had a lengthy criminal record, he did not testify as a result of this ruling.

**10.** Whether counsel's failure in this regard was constitutionally ineffective is a separate issue discussed in Part B *infra*.

delphia, so he was not in Philadelphia at the time of the murder and thus could not have committed the crime.

The right to effective assistance of counsel encompasses counsel's duty to investigate. *See United States v. Gray,* 878 F.2d 702, 711 (3d Cir.1989) (noting general agreement among courts of appeals that failure to conduct any pretrial investigation constitutes clear instance of ineffectiveness) (citations omitted). In this context, " 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Id.* at 710 (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066).

McAleese's trial counsel stated at the post-trial hearing that he did not know that the telephone company could identify the origin of non-collect, long distance calls from its records of activity at the receiving phone. McAleese testified that he had told counsel about the ability of the phone company to retrieve such records and had asked him to obtain them. Faced with this conflicting evidence, the trial court decided that trial counsel had thoroughly investigated and considered all the areas about which McAleese complained post-verdict. Implicit in this conclusion is a finding that trial counsel's testimony was credible. This finding is presumptively correct and should not be disturbed by a federal court on habeas review if it is fairly supported by the record. · *See Reese,* 946 F.2d at 254 (" 'underlying facts about counsel's performance are entitled to the presumption of correctness under 28 U.S.C. § 2254(d), if fairly supported by the record' ") (quoting *Ford v. Armontrout,* 916 F.2d 457, 460 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1594, 113 L.Ed.2d 657 (1991)); *accord Hakeem,* 990 F.2d at 767–68; *see also LaVallee v. Delle Rose,* 410 U.S. 690, 694–95, 93 S.Ct. 1203, 1205–06, 35 L.Ed.2d 637 (1973). Therefore, we conclude that trial counsel did not actually know that he could have retrieved the records at issue.

The fact that counsel was not told about this possibility and was otherwise unaware of it, however, does not end the inquiry. The question remains—was trial counsel's lack of knowledge objectively reasonable? In deciding it, we must remember that Grabowski's murder occurred in December 1982, and McAleese was convicted in June 1983. Thus, the specific question at hand is whether trial counsel's lack of knowledge of the technology available to retrieve records of incoming telephone calls at a particular location fell beneath prevailing professional norms in late 1982 through mid–1983.

The magistrate judge held that it was objectively unreasonable for trial counsel to be unaware of the phone company's ability to identify the source of incoming long distance calls because "the petitioner's lawyer at the post trial hearing had, apparently, no such difficulty." Report and Recommendation at 28; App. at 1316. Beyond the fact that McAleese's counsel during the post-trial proceedings knew of the retrieval technology, the record contains no evidence supporting the magistrate's implicit determination that all competent lawyers should have known about the technology in 1982.

Some of the questions that the prosecutors and the trial court asked during the post-verdict evidentiary hearings indicate an unfamiliarity with the retrieval technology even at that time. For example, during the post-trial proceeding, the following colloquy took place between the court and the telephone company representative:

> THE COURT: All right. Let me ask a few questions because I want to be absolutely sure of this.
>
> As I understand what you are telling me, Mr. Brook, you do maintain records which show out-going calls, I am taking this by steps, show out-going calls and to a designated number.
>
> THE WITNESS: If it is a toll call and it would be reflected on the bill, yes.
>
> THE COURT: Well, the ordinary telephone.
>
> THE WITNESS: A local call would not be reflected on the bill. Only toll calls would be shown on the bill.

If I am using my phone to call from Philadelphia to Philadelphia, that is not on the bill.

If I use my phone to call from Philadelphia to Trenton, New Jersey, it would be on the bill.

THE COURT: It's also possible, as I understand it in the same type of situation where it's a toll call, to ascertain from records of the receiving phone the phone from which a call was made. That's also on your tape, but in each case, these are kept for very brief periods of time, until billing has been accomplished.

Is that it?

THE WITNESS: Yes, the tapes are produced which we call automatic AMA tapes that are in this central office are then put into the billing computer and the bill is processed.

Those other tapes are gone forever.

THE COURT: No reason to keep them for a permanent record of it because you are interested in billing, rather than preserving records.

THE WITNESS: Right.

THE COURT: All right.

App. at 803–04.

In addition, the following colloquy occurred during the prosecution's cross-examination of the telephone company representative:

Q: ... You mentioned that if a person is to place a call to someone else, that the person who is calling—let's take a local call—if somebody makes a local call in Delaware and calls somebody anywhere else in Delaware and it's a local call, are you able to trace from either telephone where the call was made or received?

A: No, sir. That is a local call and because of that, no record of that call is maintained.

\*   \*   \*   \*   \*   \*

Q: This retrieval system that Mr. Preminger was asking you about as far as if I made a call from Philadelphia to Delaware, and then the person in Delaware naturally picks the phone up, and then you are asked at a later time, are you able to find out the number that was called from Philadelphia to Delaware?

A: Yes, sir.

Q: And what about if you only had the number of the person in Delaware, let's say, a person comes to you and says, "I don't know the phone number of where or who called me in Philadelphia, but here is my phone number," are you able to then tell the person in Delaware where somebody in Philadelphia called him from?

A: We could probably do that, yes, the same.

Q: And that's based on this taping system you have?

A: Yes.

Q: And that's what you only keep for a short period of time.

Is that correct?

A: Yes.

Q: As for long distance.

What about for local calls?

A: No, there is no record of local calls maintained.

Q: So if somebody were to call—if I were to call from an anonymous phone number in Delaware and then I called let's say 111, okay let's say that's somebody['s] phone number, and you then went and subpoenaed or produced the numbers or the records for 111, and it was a local call, is there any way you could tell what number I called in?

A: No, sir.

THE COURT: In other words, toll calls are the only ones—records of toll calls are the only ones kept.

THE WITNESS: Yes.

THE COURT: All right.

*Id.* at 805–07.

Similarly, at the post-trial proceedings the following exchange took place during defense counsel's direct examination of trial counsel:

BY MR. GELB:

\*   \*   \*   \*   \*   \*

Are you aware of a procedure whereby magnetic tapes can be obtained from the phone company which would verify wheth-

er or not a long distance call had been made from one number to another?

MRS. FOULKES [for the prosecution]: Your honor, I have to object on the ground of a highly speculative premise and that premise is and I believe based on the questions of the Bell Telephone representative that had been called before that before such a communication could be investigated one would have to know from what number the telephone call was made.

In other words, you couldn't relate back from the receiving call to some unknown long distance number to determine where that call was placed unless it had been placed in a collect call situation or some situation where a recording would be made.

I think we are getting into the relm [sic] of highly speculative availability of certain evidence, and to subject counsel to questioning in that regard I think really won't further this inquiry.

THE COURT: A Bell Telephone representative did appear at the last hearing as I recall and rather definitively discussed this entire situation as to whether this was possible, feasible, was it done, all that type.

MRS. FOULKES: Yes. My understanding of the testimony was that where you have one number you don't have to have both numbers. You can have one number in order to be able to determine what calls were received or what calls went out.

THE COURT: From the calling number.

MRS. FOULKES: The calling number, the receiving number, that's the question.

MR. GELB: The received number which in this case presumably would be Mr. Natalie's number. That's the point I am making and I think that was the gist of his testimony.

MRS. FOULKES: That's counsel's interpretation of it. I will object subject to it's [sic] being determined to be irrelevant later.

That was not my understanding of the reading of that representative [sic] testimony.

THE COURT: That wasn't mine, either. However, go ahead.

*Id.* at 972–75.

Because there is no evidence in the record to support the conclusion that a competent criminal defense attorney should have known about the retrieval technology in late 1982 through mid–1983, we cannot conclude that the failure of McAleese's trial counsel to attempt to retrieve Natalie's phone records was objectively unreasonable.

Moreover, even if trial counsel should have known of the available technology, McAleese still must show he was prejudiced by the absence of the phone records in order to prevail. The expert testimony that McAleese presented at the post-trial evidentiary hearing in 1985 showed only that retrieving records of incoming long distance calls was indeed possible and might have been accomplished. The expert witness testified:

> [I]t is possible to do that within a certain time-frame, and I am talking about a relatively short time-frame, that if a call is made to a number, we can go back over the tapes and retrieve information similar to what you are requesting, but as I said, that's a very short time-frame [thirty to sixty days] and we do not normally do that unless it is a life and death type of situation.

*Id.* at 800. The expert later testified that the phone company would retrieve the calls pursuant to judicial subpoena:

> Given that our system is not perfect within the relms [sic] of what we can do, we most likely, if we were ordered to do so, with great effort [would retrieve them]. It is not an easy thing to do, but we could probably find out where that call came from.

*Id.* at 800–01.

This testimony indicates that it was more likely than not that had trial counsel subpoenaed phone records of Natalie's long distance calls, he probably would have gotten them. Once the records were subpoenaed, however, they would become equally available to the Commonwealth. They would have shown one of two possibilities: Either (1) a call or calls at the crucial time from Philadelphia,

thus precluding the possibility of alibi, or (2) no calls from Philadelphia, thus supporting the inference that McAleese was in Wilmington or at least not in Philadelphia at the pertinent time. We have no way of knowing which.

The possibility of exoneration stemming from the phone records is not enough to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. As the *Strickland* Court emphasized, it is not enough to show that the error may have had some "conceivable effect" on the outcome, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693, 104 S.Ct. at 2067; *see Larsen v. Maggio*, 736 F.2d 215, 218 (5th Cir.) (petitioner must demonstrate that "might have beens" would have been important enough to affect proceedings' reliability), *cert. denied*, 469 U.S. 1089, 105 S.Ct. 598, 83 L.Ed.2d 707 (1984).

McAleese cannot contend that his trial counsel abdicated the duty to investigate recognized in *Strickland. See Gray*, 878 F.2d at 712 (citing *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2065–66). The record shows that trial counsel tracked down and presented as witnesses five disinterested persons who testified as to McAleese's whereabouts on the day of the crime. This testimony supported a plausible defense. The telephone records had the potential of destroying that defense. If the telephone records had indeed shown a call to Natalie's office from Philadelphia at approximately 3:00 p.m. on December 1, 1982, the prosecution could have subpoenaed them as evidence in its case-in-chief against McAleese. Even assuming that trial counsel's failure to attempt to retrieve Natalie's phone records fell below prevailing professional norms, McAleese has not shown he suffered prejudice from the absence of the phone records at trial.

Finally, we note that the Commonwealth's case against McAleese, while not iron-clad, was not a weak one. *Cf. Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"); *Gray*, 878 F.2d at 711. Considering the brutality of the murder and all the evidence indicating McAleese did carry out his intent to call on Mrs. Grabowski about the time she was brutally murdered, we note that the defense successfully avoided a verdict of first degree or capital murder. We are unable to call such a defense ineffective. Trial counsel may not have tried a perfect case, but a criminal defendant is not entitled to a perfect lawyer. None has ever existed. We hold that McAleese's trial counsel was not ineffective.

## V. *Conclusion*

*Strickland* emphasizes that a court's evaluation of an attorney's performance must be "highly deferential" in order to diminish the possible distortions of hindsight. 466 U.S. at 689, 104 S.Ct. at 2065. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Even if counsel's performance falls beneath prevailing professional norms, his client must still establish that he has suffered prejudice from that deficient performance in order to prevail on a claim of ineffective assistance of counsel. *Id.* at 692, 104 S.Ct. at 2067. Applying these principles, we conclude that McAleese's trial counsel was not constitutionally deficient.

First, his decision not to call Natalie as a witness did not break any promise, either implicit or explicit, to the jury to provide an alibi defense. Moreover, that decision reflects sound trial strategy. Standing alone, Natalie's testimony would have done little more than bolster McAleese's loose alibi defense. Coupled with the phone records—if they existed, were retrievable, and showed no long distance calls—his testimony would have been meaningful, but the jury would have been left to speculate about the nature of McAleese's call to Natalie. Trial counsel had built an image of McAleese as a hard-working citizen, and he understandably did not want to risk shattering that image.

Second, the record establishes that trial counsel did not subjectively know that Natalie's incoming telephone calls could be re-

trieved, and there is no substantial evidence supporting the conclusion that counsel should have known in late 1982 through mid–1983 that such technology existed. Even assuming that trial counsel's lack of knowledge was objectively unreasonable, McAleese suffered no prejudice from the absence of the records of Natalie's incoming calls because the possibility of exoneration arising from those records was minimal under the circumstances of this case.

For these reasons, the representation McAleese's trial counsel provided comported with the Sixth Amendment guarantee of effective assistance of counsel. Accordingly, we will reverse the district court's order granting McAleese a writ of habeas corpus.