**Johnnie L. EDWARDS, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 92–CF–181, 97–CO–1583, 98–CO–872.

District of Columbia Court of Appeals.

Argued Sept. 8, 1999.
Decided Feb. 22, 2001.

---

Kurt H. Jacobs, with whom Jeffrey T. Green, Washington, DC, appointed by the court, were on the brief, for appellant.

Amul Thapar, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth H. Danello, and Arthur G. Wyatt, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and STEADMAN, Associate Judge, and NEWMAN, Senior Judge.

WAGNER, Chief Judge:

Appellant, Johnny L. Edwards, was convicted of second-degree murder of his infant daughter, Beyound JX. Edwards ("Tweety Bird" or "Bird") (D.C.Code § 22–2403) (1996 Repl.); assault with a dangerous weapon (hot liquid) of the infant's twin sister, Beyound SY. Edwards, ("Sparky") (D.C.Code § 22–502) (1996 Repl.); and two counts of cruelty to children involving each child (D.C.Code § 22–901) (1996 Repl.). Appellant argues for reversal on the following grounds: (1) ineffective assistance of counsel for failing to produce evidence supportive of the representations he made in opening statement and failing to investigate adequately the mental illness of the children's mother,

Stacy Edwards; (2) instructional error; (3) admission into evidence of prejudicial photographs; (4) improper argument by the prosecutor; and (5) sentencing error. We conclude that appellant failed to establish prejudice on his ineffectiveness claim that would justify relief under D.C.Code § 23–110 (1996 Repl.). We find no reversible error on appellant's remaining claims, and, therefore affirm.

## I. *Factual Background*

Joyce Edwards, one of appellant's teen-aged daughters, testified at trial that on October 24, 1990, appellant noticed that his eighteen-month-old twin daughters had what looked to be mosquito bites on their legs and directed her and her sister, Jenine,[1] to go to the store and purchase bleach, peroxide and rubbing alcohol. When they returned with the items, appellant directed Joyce and his wife, Stacy Edwards, "to get the tin tub and draw some water." She said that they complied and that appellant poured the bleach, peroxide and alcohol into the water. According to Joyce's testimony, her father had one of the babies and asked her to get the other one, and they put them in the tub. Joyce testified that Bird "looked like she wanted to get out of the water." She said that Tweety Bird whined and reached her hands in the air. She testified that appellant told her to "cap it" and hit her gently on the head with an empty plastic Coke bottle.

Jenine Edwards testified that she tested the water and told appellant that it was too hot for the babies, but he placed them in the water anyway. She further testified that her sister, Joyce, assisted her further in placing the twins in the water. She testified explicitly that her mother did not put the children in the water. She provided the following description of the incident:

> ever[y] time she would cry my father would hit her on her head with a plastic coco [sic] cola bottle and say, cap it, Bird, cap it, Sparky. And Bird would raise her hand like this, she said—in a way she couldn't talk but she said don't do that. And my father laughed and hit her again.

Jenine testified that her father took Sparky out after thirty minutes, and he took Bird out after thirty-five minutes. She described the skin around Sparky's vaginal area as pink, and she said that Bird's vagina and leg were bleeding. According to Jenine, appellant then sprinkled salt and baking soda on Bird's vagina area and put a diaper on her. She said that Bird was gasping for air and "wasn't breathing right." Jenine further testified that later that evening when she changed Bird's diaper, the pamper stuck to her.[2]

Joyce Edwards testified about Bird's condition before Bird was hospitalized. She testified that on Friday, October 26, 1990, Bird had a fever, could not move, and her skin was burned. She testified that she was trying to feed Bird, and the child closed her eyes and stopped breathing. Joyce ran to a neighbor's house and called for an ambulance, which transported Bird to the hospital. Bird was taken to Greater Southeast Hospital where she was resuscitated. Thereafter, Bird was taken to the emergency room at Children's Hospital.

---

1. Jenine's name has been spelled "Jeannine" and "Jeanine" throughout the transcript and record. Jenine's sister, Joyce, provided the spelling used in this opinion.

2. Shortly after the bath, appellant and his wife got into an argument, and Jenine called the police. Upon the arrival of the police, appellant and Joyce moved the babies to another apartment in the building. Joyce testified that appellant told her to move the babies "[b]ecause he didn't want the police to take the babies due to their conditions." The police did not go inside the building to investigate even though she reported that her "mother and father was [sic] fighting and then Bird, she was bleeding on the vagina and ... my father had just put her in some chemicals." Thereafter, the police took Stacy Edwards to St. Elizabeth's Hospital and took Jenine to a friend's home.

While at the hospital, Herbert Boyd, a consultant in child protection cases at Children's Hospital, interviewed appellant. Mr. Boyd testified that in discussing the events which brought the child to the hospital, appellant informed him that he was treating Bird for a rash by submerging her in "not that hot" water. Appellant further informed Mr. Boyd that he had used the same tub the previous night and that there might have been some residual bleach in it. When Mr. Boyd asked whether appellant had noticed anything that would indicate that Bird was burned, appellant stated that "there were some blisters" and that the day after the bath he patted Bird down and "some of her skin came off." Appellant also told Mr. Boyd that Bird appeared to be lethargic and "a little tired looking but he did not observe or feel as if she was in any severe discomfort." When Boyd asked appellant whether he felt Bird needed medical attention, appellant responded that "he was going to treat it himself."[3] Boyd testified that he periodically updated appellant on the child's condition, which was deteriorating, and appellant never informed him that Sparky had also been placed in the chemical bath. Mr. Boyd further testified that appellant did not say that Stacy Edwards or his daughter, Joyce, had anything to do with the lethal bath.

Dr. Judson Randolph, Chief of Surgery and Director of the Burn Unit at Children's Hospital at the time of the incident, testified that Bird had "massive burns" covering approximately forty-percent of her body.[4] He opined that Bird's injuries were caused by scalding and that it was "[a]bsolutely unlikely" that an eighteen-month-old child would remain voluntarily in water sufficiently hot to cause third-degree burns.[5] Finally, Dr. Randolph testified that the addition of hydrogen peroxide, rubbing alcohol, bleach, and other detergents "[p]robably wouldn't make any difference."

Dr. Marie Loydie Pierre–Louis, Deputy Medical Examiner for the District of Columbia, an expert in the field of forensic pathology, testified similarly with respect to the condition of Bird's body prior to performing the autopsy. She testified that Bird never regained consciousness while at Children's Hospital. Dr. Pierre–Louis further testified that Bird's death was caused by "extensive chemical internal scalding, body burns, followed by repair multi-system failure in [coma]."[6]

The jury found appellant guilty as charged, and he noted an appeal. While the appeal was pending, appellant, through appointed counsel, filed a motion to vacate his conviction alleging ineffectiveness of trial counsel pursuant to D.C.Code § 23–110, and this court stayed the direct appeal pending resolution of the motion. In the § 23–110 motion, appellant argued that his trial counsel was constitutionally defective in that he

1) inadequately investigated other possible defense theories by electing the "Stacy did it" defense with no evidentiary support while ignoring the defense of "accident" or "lack of intent" for which evidence did exist; 2) failed to conduct a reasonable investigation before selecting and going forward with the "Stacy did it" defense; and 3) failed to produce evidence promised in the opening statement which evidenced deficient perfor-

---

3. Appellant told Mr. Boyd that he treated Bird's skin with Vaseline and cocoa-butter.

4. Dr. Randolph further stated with regard to the burned area that "[a]bout two-thirds of that were third degree or full thickness injury with large areas of her legs, perineum or the part of her genitalia and anus, and her buttocks in the large area cross her abdomen were all full thickness injury."

5. Dr. Randolph further stated that, "Eighteen months old, their [sic] like little moving things and they would just jump right out or climb or cry and try to get over the edge of the tub."

6. The term "repair" meant that "the child had been in the hospital and there had been surgical incision on both sides of the legs."

mance by trial counsel prejudicing the defendant.

After a hearing and briefing, the trial court denied the motion, concluding that appellant had not demonstrated either deficient performance or prejudice. Appellant filed a timely notice of appeal (No. 97–CO–1583), which was consolidated with the direct appeal. Subsequently, appellant filed a *pro se* motion to vacate his enhanced sentence. The trial court denied this motion for lack of jurisdiction, and appellant appealed (No. 98–CO–872).

## II. *Claim of Ineffective Assistance of Counsel*

Appellant raises two arguments challenging the effectiveness of his trial counsel. First, he argues that his trial counsel's performance was deficient in that he promised in opening statement to present evidence of the mental condition and actions of Stacy Edwards and failed to call experts or witnesses to present this evidence. In support of this argument, he points out that: (1) trial counsel testified that he never had a commitment from any expert to testify, assuming he could obtain a proper release of the records and waiver of Mrs. Edwards' physician-patient privilege; and (2) the records did not support counsel's claims. Second, he contends that his trial counsel was ineffective in failing to investigate and prepare the defense that Stacy Edwards committed the offense, thereby undermining this defense and preventing an informed tactical choice among defenses. Appellant contends that he was prejudiced by the deficiency because failure to deliver the evidence as promised potentially caused the jury to "believe that no witness would testify to these claims, that trial counsel's assertions about Stacy Edwards' psychological condition and aggressiveness were untrue, and that the defense theory as a whole was concocted, leading to the belief that Mr. Edwards must be guilty of the crimes charged."

■ The standard governing claims of ineffective assistance of counsel are well-established.

First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense. This requires [a] showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Dobson v. United States*, 711 A.2d 78, 83 (D.C.1998) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Deficient performance requires a showing that counsel's "errors were so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Scott v. United States*, 619 A.2d 917, 922 (D.C.1993) (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052). To show prejudice,

[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Scott*, 619 A.2d at 922 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052); *see also Dobson*, 711 A.2d at 83. Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Strickland*, 466 U.S. at 700, 104 S.Ct. 2052. A court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697, 104 S.Ct. 2052.

In support of his claim of ineffective assistance of counsel, appellant primarily relies on *Dobson, supra,* 711 A.2d 78. In *Dobson*, the appellant challenged the denial of his § 23–110 motion without a hearing. The trial court "failed altogether to address [appellant's] most plausible claim, namely, that counsel's promise of an alibi in his opening statement, combined with his subsequent failure to present available

alibi testimony, substantially prejudiced [appellant's] defense." 711 A.2d at 83. The trial court's denial of the motion without a hearing was based upon its misapprehension that Dobson's challenge went to only whether counsel was ineffective for failing to call alibi witnesses. *Id.* at 82–83. Therefore, the case was remanded to address the unaddressed issue. *Id.* at 79–80. However, significant to this case, this court recognized in *Dobson* that a failure to produce evidence promised in opening statement may constitute ineffective assistance of counsel. *Id.* at 82–83. Specifically, the court stated that

> [t]he appearance that the defense has overstated its evidence, and cannot be trusted to keep its promises, may have a significant effect on the jury's evaluation of a case, and especially on a close case. In the absence of a finding by the judge addressing [appellant's] main contention, we are compelled to conclude that the order denying the motion without a hearing was based on a misapprehension as to the precise issue before him.

*Id.* (footnote omitted).

Several federal circuits have held that the failure of defense counsel to produce evidence promised in opening statement supports a claim of deficient performance of trial counsel and may be sufficiently prejudicial to warrant a new trial. *See, e.g., McAleese v. Mazurkiewicz,* 1 F.3d 159 (3rd Cir.), *cert. denied,* 510 U.S. 1028, 114 S.Ct. 645, 126 L.Ed.2d 603 (1993); *United States v. McGill,* 11 F.3d 223 (1st Cir. 1993); *Harris v. Reed,* 894 F.2d 871 (7th Cir.1990); *Anderson v. Butler,* 858 F.2d 16 (1st Cir.1988). In *Anderson,* appellant was convicted of first-degree murder in the stabbing death of his estranged wife, whom he had found in a bedroom with a partially clad man. *Anderson,* 858 F.2d at 16. Defense counsel promised the jury in opening statement that he would call a psychiatrist and psychologist, whose testi-

mony would show that appellant had acted unconsciously, "like a robot programmed on destruction." *Id.* at 17. In spite of the availability of doctors and reports in support of this statement, defense counsel made a tactical decision not to produce this evidence, explaining to the jury in closing that "there is no amount of psychiatric and psychological evaluations that were going to present a better picture of what you have already heard."[7] *Id.* at n. 1. In a *habeas* proceeding, the District Court had found no deficiency in counsel's performance, and therefore did not consider prejudice. The Circuit Court, with one judge dissenting, concluded that promising such powerful evidence and then not producing it was prejudicial as a matter of law in this case. *Id.* at 19. The court explained that this was not the case of abandoning a defense, but of damaging the primary defense upon which Anderson relied. *Id.*

In *McAleese, supra,* the court stated that "[t]he failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel." *McAleese, supra,* 1 F.3d at 166 (citation omitted). However, in *McAleese,* having examined counsel's statement, the court concluded that defense counsel did not implicitly or explicitly break any promise to provide an alibi from a particular witness, as claimed. *Id.* at 167, 175.

In *McGill, supra,* the First Circuit addressed a similar issue. The defense counsel promised in opening statement to produce a firearms expert, without explaining what the substance of the testimony would be, but later decided not to call him. *McGill,* 11 F.3d at 227. The court found no deficiency in counsel's performance, since counsel succeeded in eliciting through cross-examination of the prosecution's expert the same opinion he expected

---

7. Apparently, people who really knew Anderson had testified to his conduct that night. *See Anderson, supra,* 858 F.2d at 17.

to develop through his own expert, and he discovered that the retained expert could be impeached. *Id.* The *McGill* court recognized that "[a]lthough a failure to produce a promised witness may under some circumstances be deemed ineffective assistance ... the determination ... is necessarily fact-based." *Id.* (internal citation omitted).

We agree that the determination is necessarily fact-based. That determination depends upon such factors as the nature and extent of the promises made in opening statement, any strategic justifications for the subsequent decision not to produce the evidence, the explanation provided the jury for the failure to produce the evidence, the presentation of other evidence supporting the promised theory, and generally, the impact upon the defense at trial and upon the jury. *See id.* at 227; *Harris, supra,* 894 F.2d at 877–79. Only by examining the circumstances can a de-

termination be made of whether counsel made reasonable tactical choices in light of the situation as it appeared at the time and whether the change of tactics prejudiced the defense. " 'No particular set of rules can be established to define effective assistance, as hard-and-fast rules would inevitably restrict the independence and latitude counsel must have in making tactical and strategic decisions.' " *McGill,* 11 F.3d at 227 (quoting *United States v. Natanel,* 938 F.2d 302, 310 (1st Cir.1991), *cert. denied,* 502 U.S. 1079, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992)). Therefore, we reject any *per se* rule that unfulfilled promises by defense counsel during opening statement will result automatically in a finding of deficient performance of counsel and prejudice to a defendant.

We begin our analysis in the present case with a review of defense counsel's opening statement, which is reprinted in the margin in pertinent part.[8] In sum-

---

8. Trial counsel made an opening statement immediately following the prosecutor's opening. In pertinent part, counsel stated:

When John Edwards walked through the front door to his apartment that night to his horror he found what his wife Stacy Edwards had done to their children. Unbeknownst to Mr. Edwards while he was away Stacy Edwards had placed the twins in a tub of scalding water filled with chemicals.

The evidence will show you that on October 24th, 1990, Stacy Edwards left the mental institution where she had been committed. She left that mental institution to get her babies, and, sadly enough, ladies and gentlemen, Stacy Edwards got her babies. She got her babies and she caused the injuries that killed one of them.

By the time Mr. Edwards got home that night, it was simply too late. The tragedy had already happened. Mr. Edwards did not kill his daughter. Stacy Edwards is the one who did. The evidence will show you that Mr. Edwards is an innocent man.

Why then is John Edwards on trial in court today for this crime? ... After Mr. Edwards discovered what his wife had done to the twins a terrible argument began between him and Stacy Edwards, his wife, about what she had done.

* * * *

You see, ladies and gentlemen, someone had to take the blame and it was John Edwards who became a scapegoat for a

crime that he did not commit. And, indeed, later at the hospital John Edwards agreed to shoulder the burden for that crime.

He told a story. He told a story that was not true. You will learn that his story makes no sense and you will learn why he told that story. You will learn that his story is inconsistent with the evidence and it's inaccurate because John Edwards could not know and did not know what happened in that apartment. He was not there.

* * * *

In order to decide this case, you will need to learn more about Stacy Edwards. The evidence will show that Stacy Edwards is mentally ill. The evidence will show that Stacy Edwards has spent the better part of her adult life committed to a mental institution. Stacy Edwards suffers from schizo[a]ffective disorder.

That disorder causes her to hear voices. Those voices are not real, but Stacy Edwards believes those voices and she obeys their insane commands.

You will learn that in October of 1990, Stacy Edwards became psychiatrically unstable. She was paranoid, she was suffering from delusions and she was aggressive.

mary, counsel informed the jury that, unbeknownst to appellant, Stacy Edwards had placed the twins in the scalding water, that she suffered from a mental illness, that she obeyed the commands of voices she heard as a result of her illness, and that she became psychiatrically unstable during the month that the children were hurt. Appellant argues that, as trial counsel testified during the hearing on the § 23–110 motion, he never had an expert who had committed himself to testify; that such evidence could only be presented if Mrs. Edwards waived her physician-patient privilege and permitted her medical records to be released by the hospital; and that the records, even if obtained through proper procedures, did not support the claims made. Defense counsel promised no specific witness who would support his claims.

The trial court entered an order denying the § 23–110 motion with the following reasons, in pertinent part, for its determination:

As to the first prong of the *Strickland* test, whether Edwards has shown deficient performance from trial counsel, defendant necessarily fails for several reasons.... The Court, having observed co-counsel's participation at trial credits [trial counsel's] testimonoy [sic]. Second, trial counsel testified at the hearing that an insanity defense was explored and an expert was hired to either substantiate that defense or render it moot. Because defendant was found sane, [counsel] was compelled to explore other viable defenses. Third, as defendant's versions of the events changed, so did the defense strategy have to change. [Trial counsel] testified at the § 23–110 hearing that defendant told him that he *was never* at the home on the night of the bathing incident, but at some point before trial, *recanted* his version of the story and then told [him] that he *was* there. Further, trial counsel knew that he could not choose an accident defense because there was evidence that Ed-

wards had previously been adjudicated in the abuse and neglect system for abuse or neglect of all eight of his children causing judicial removal. In addition, the Court was never informed of approximately when [counsel] learned of defendant's newly revised version of the events regarding the night of the bath or whether [he] in fact learned of all of the details of Edwards' new version of the events. The Court concludes that defendant's conduct and revision of his information kept counsel on a "slippery slope", never sure what the defendant required of him or what defense he could mount based on defendant's representations. The Court finds no fatal deficiency in counsel's performance.

The trial court determined that the second prong of *Strickland* was not met here for the following reasons:

Defendant maintains that had trial counsel chosen "lack of intent" or "accident" defense there would have been a "reasonable probability" that Edwards would have been either acquitted outright or convicted of a lesser offense. Alternatively, trial counsel claimed that "accident" could never have been a viable defense due to the fact that there was evidence that defendant intended to hurt the children. At the hearing, [trial counsel] testified that one of his tactics was to allow the jury to hear the testimony of defendant's daughters, Joyce and Jeanine, [sic] because he was assured that it would infer that the daughters were lying to the Court and had a motive to lie to the Court. Based on the trial record of eyewitnesses to the bath (i.e. Jenine Edwards and Donna Coleman) and expert witnesses (i.e. Drs. Judson Randolph and Marie Pierre–Louis), the Court finds it unlikely that any countering testimony from defense counsel could have outweighed the testimony of the government's witnesses in the mind of a jury. There was only one other person present during the bath, Stacey, [sic] counsel did not call her as a

witness. Evidence of defendant's love of his children or character would have resulted in the neglect matters being introduced to the jury. "Trial tactical decisions generally do not result in a finding of ineffective assistance of counsel." *Zanders v. United States*, 678 A.2d 556 at 569, App. DC (1996)[sic]. It is not the trial Court's function to second guess trial counsel's judgment. *Carter v. United States* [, 475 A.2d 1118, 1123 (D.C.1984), [sic] *cert. denied*, 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985) ]. ["]Alternative tactics are available to defense attorneys and their actions are often the products of strategic choices based on a subjective assessment of the circumstances existing at trial." *Zanders* at 569[sic].

Our task is to decide whether the trial court erred in determining that counsel's performance was not constitutionally deficient and that the deficiency, if any, did not affect the outcome of the trial.

 Under *Strickland*, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment in a criminal proceeding if the error had no effect on the judgment." *Strickland, supra*, 466 U.S. at 691, 104 S.Ct. 2052. Thus, failure to make the required showing of either deficient performance or sufficient prejudice will defeat a claim of ineffective assistance of counsel. *Id.* at 700, 104 S.Ct. 2052. Assuming, without deciding, that counsel's performance fell outside of the wide range of competent assistance,[9] appellant did not meet the burden of showing prejudice under the circumstances presented here. That burden requires appellant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome [of the trial]." *Id.* at 694, 104 S.Ct. 2052.

 Appellant claims that by advancing the defense that Mrs. Edwards committed the offense without adequate preparation and previewing it in opening statement without evidentiary support, he was prejudiced because he was precluded from presenting a defense for which there was substantial evidence, *i.e.*, the defense of accident or lack of intent. In this case, there was overwhelming evidence that appellant directed and participated in placing the young twins in the scalding chemical bath and kept them there for a lengthy period of time in spite of Jenine's warning that it was too hot and the children's efforts to escape. Dr. Randolph, the burn expert, testified that a baby placed in water sufficiently hot to cause the injuries from which Tweety Bird ultimately died would have been screaming and squirming to get out. Even after appellant saw signs of injury on the first child who was taken out of the tub, he kept the child who died in the bath several more minutes. This evidence showed that appellant acted "in conscious disregard of an extreme risk of death or serious bodily injury," the requisite intent for second-degree murder. A neighbor, Mrs. Coleman, testified that after appellant heard his daughter calling the police, he asked her and Joyce to assist him in secreting the babies, thus showing consciousness of guilt. Appellant failed to seek medical attention for Bird for the next three days in spite of her serious injuries. The defense of accident

---

9. We note that the record supports the trial court's finding that the defense team engaged in extensive preparation for this case. Further, this is not a case where trial counsel promised to produce particular witnesses, and there was evidence that Stacy Edwards had been hospitalized at a mental hospital, and at one point, inconsistent with her testimony at trial, Jenine had stated that her mother also participated in placing the child in the hot bath. Thus, it appears that this is not a case where trial counsel's promise of producing evidence bearing upon a certain theory was totally unfulfilled. Nevertheless, in light of our disposition based on the second prong of *Strickland, i.e.*, lack of prejudice, we need not resolve whether counsel's performance was deficient.

or mistake does not appear to have been remotely viable in the face of this evidence. Moreover, the trial court had already ruled that if appellant opened the door by claiming accident, numerous acts of prior physical abuse by appellant of his children, which included evidence of his beating the twins, could be admitted in evidence. Under the circumstances, the decision of counsel not to pursue a defense of accident or mistake represents an eminently reasonable tactical choice. Appellant did not show any reasonable probability that the outcome of the trial would have been different absent the errors claimed by appellant; therefore, our confidence in the outcome of the trial is not undermined. *Strickland, supra,* 466 U.S. at 686, 694, 104 S.Ct. 2052.

### III. *Claim of Instructional Error*

Appellant argues that the trial court erred in giving the jury an aiding and abetting instruction over his objection, since the indictment did not allege that he aided or abetted any other principal. He contends that this instruction permitted the jury to convict him even if it did not find that he intended to harm Bird. Furthermore, by giving the instruction, the prosecution did not have to establish, nor was there any evidence, that someone other than appellant was the principal whose actions met the elements of the second-degree murder charge. He also contends that the instruction undermined his defense that he was not present at the time of the bath.

■ Whether to give an aiding and abetting instruction is left to the sound discretion of the trial court. *See Tyler v. United States,* 495 A.2d 1180, 1183 (D.C. 1985). The proof necessary to convict an individual for aiding and abetting is set forth in D.C.Code § 22–105 (1996 Repl.).[10]

In order to prove aiding and abetting, the government must prove that "(a) a crime was committed by someone; (b) the accused assisted or participated in its commission; and (c) his participation was with guilty knowledge." *Jefferson v. United States,* 463 A.2d 681, 683 (D.C.1983) (citation omitted). "While a defendant may be charged and convicted as the principal even though the proof is that he was only an aider and abettor ... there must be evidence that someone other than defendant was the principal whom the defendant aided and abetted." *Payton v. United States,* 305 A.2d 512, 513 (D.C.1973) (citations omitted); *see also Brooks v. United States,* 599 A.2d 1094, 1099 (D.C.1991).

■ The trial court did not abuse its discretion in giving the jury an instruction on aiding and abetting. Appellant's defense at trial was that "Stacy did it." During opening statements, and closing argument, appellant's trial counsel continuously attempted to shift the blame for the scalding of Bird away from appellant to his wife, Stacy. In fact, appellant's counsel stated in closing that

the evidence has shown that Mr. John L. Edwards left his home that night earlier in the evening. Unbeknownst to him, his wife, Stacy Edwards, his wife of many years, had left the mental institution where she had been committed for most of her adult life. She left ... the mental institution on a mission. Indeed a, [sic] I submit, a monstrously evil mission—to get to her babies. And she got these babies.

There was some testimony that either Stacy or Joyce Edwards or both placed the babies in the tub. There was evidence that appellant hit the twins on the head with an empty plastic coke bottle in order to keep them in the tub. Thus, there is at least some evidence "that someone other

**10.** D.C.Code § 22–105 reads as follows:
In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and

not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall apply to all crimes, whatever the punishment may be.

that defendant was the principal whom the defendant aided and abetted." *Payton, supra,* 305 A.2d at 513; *see also Brooks, supra,* 599 A.2d at 1099. Therefore, given the defense in this case and the evidence of the participation of someone else in preparing and placing the children in the bath, it was not an abuse of discretion for the trial court to give the instruction.

## IV. *Claim of Improper Admission of Photographs*

■ Appellant argues that the trial court abused its discretion in admitting certain photographs of Bird undergoing treatment in the hospital two to three days after the bathing incident and of Bird's

11. After considering the arguments of the parties, the trial court ruled as follows with regard to the photographs taken at the hospital:

> The photographs are disturbing, but not immaterial or irrelevant to these proceedings. This child was injured and died, did not die at the time of the injuries sustained. There was an ongoing medical attempt to not have this be a homicide. There's also a charge in the indictment of cruelty to children. There are two counts, one [Beyound JX.] and one for [Beyound SY.]. Given that there is a need to show injury independent of death, these photographs are appropriate....

Thereafter, the trial court indicated that it would permit the government to admit two of the four photographs taken at the hospital. The trial court then heard argument with regard to admission of the nine photographs taken at the medical examiner's office. The following discussion took place:

> The issue is are these photographs intended to inflame the jury. They have some relevant, material purpose. We have a proposition that a child was placed in a bathtub, an eighteen-month-old, in a seated position, from which injuries, scald burn injuries occurred which resulted in that child's ultimate death.
>
> Now, [photographs] One and Eight clearly would be needed for the medical examiner to determine whether or not the burns are consistent with the child seated in the bathtub. So they have to come in just because the pattern would be substantiated. The Government is not bound to only give evidence by recitation, by verbal recitation, if it can give pictorial evidence which illustrates or is demonstrative of the point that is being sought to be conveyed and made understandable to lay persons.

body taken in the medical examiner's office. He contends that he offered to stipulate "as to (1) identity and (2) the cause of Tweety Bird's death—*i.e.,* that Tweety Bird was placed in a sitting position in a tub of hot water from which she suffered burns and that those burns resulted in her death." Furthermore, appellant asserts that the trial court admitted the photographs "without weighing the probative value of the photographs versus their prejudicial effect, and certainly without considering their probative value in light of the proffered stipulations and the fact that the treating physician and Medical Examiner would also be testifying." [11]

> Nine is obviously, because it's the only view of the chest up, the head, neck and upper shoulder area where there are injuries—in fact, all of these photographs would aid, and that's the issue, would it aid the medical examiner in demonstrating or showing why he came to certain conclusions about this child's injuries and the cause of death of this child ultimately.
>
> Given that standard, all of these pictures could be admissible on that point, to assist the medical examiner in explaining to lay persons his conclusions about this child's death, the causation.
>
> I note [the government] makes the appropriate representation, that all these photographs may not come into evidence. There will come a time when [the government] will have to pick and choose, since all of these photographs would indeed mitigate the Court in controlling or admonishing the jury relative to how they must assess and evaluate the evidence. At the time, I admonish how the photographs may be used, I will ask the Government, prior to that point in the testimony, to advise the Court and counsel which photographs will be used for illustrative purposes, and if all of them are to be used, I will again entertain or reconsider a motion as to cumulative effect.

Thereafter, the government asked the following:

> Your Honor, is it fair to say, then, that at least as to these photos on an individual basis, leaving aside the cumulative effect, the Court is ruling the probative value outweighs any prejudice to the Defendant?

The trial court responded affirmatively and ruled that the nine photos could be used by the medical examiner.

■ It is well-settled that "the government has a large measure of discretion in deciding to accept or reject an offer to stipulate." *United States v. Washington,* 227 U.S.App.D.C. 184, 194, 705 F.2d 489, 499 (1983). The trial court's decision to admit relevant evidence over a stipulation should not be disturbed absent a showing of " 'grave abuse.' " *Id.* at 499 (quoting *United States v. Allen,* 203 U.S.App.D.C. 17, 24, 629 F.2d 51, 58 (1980); *United States v. Wright,* 160 U.S.App.D.C. 57, 62, 489 F.2d 1181, 1186 (1973)). "[T]he accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away rests on good sense." *Old Chief v. United States,* 519 U.S. 172, 189, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). The government was entitled to use the pictures not only to establish the elements of second-degree murder (*i.e.,* malice), but also to establish the elements of cruelty to children (*i.e.,* intentionally, knowingly, or recklessly tortures, beats or otherwise willfully maltreats a child).[12] The trial court carefully examined the photographs, admitting some and excluding others. We are satisfied that the trial court did not abuse its discretion in admitting the photographs.

### V. *Claim of Improper Rebuttal Argument*

■ Appellant argues that the government engaged in improper rebuttal argument. Specifically, appellant cites the prosecution's statements to the jury that "you took an oath to decide this case without fear, without fear. If you make a mistake, if a mistake is made in this case[,] Mr. Edwards has the right to appeal to the Court of Appeals and they can give him a brand new trial and start all over again if a mistake was made. Don't be afraid to go back and make the decision." Appellant contends that these statements misled the jury as to its function as the finder of fact. He asserts that the statements "not only misinformed the jury but reduced the

jury's conception of the importance of its role." In addition, appellant maintains that the government's

> prefatory remarks to the effect that "the government" had already taken the burden of proof standard into account at several prior pretrial stages—*i.e.,* when entering charges, asking the grand jury to vote, and determining to proceed to trial—were further designed to diminish the jury's sense of importance of its responsibilities and, if the jury did have any doubts about Mr. Edwards' guilt, to cause the jury to put aside or counter such doubts with the knowledge that other groups of informed, government persons had concluded that Mr. Edwards was guilty beyond a reasonable doubt.

Appellant concedes that he did not object to the government's comments at trial.

In evaluating appellant's claim of prosecutorial impropriety, this court must "first determine whether the prosecutor's comments constituted misconduct." *Irick v. United States,* 565 A.2d 26, 32 (D.C.1989) (citations omitted); *see also Bowman v. United States,* 652 A.2d 64, 70 (D.C.1994). Once a determination has been made that the prosecutor's comments were improper, this court must then

> determin[e] whether prosecutorial [impropriety] infects a verdict [by] . . . balanc[ing] . . . the gravity of the [impropriety], its direct relationship to the issue of innocence or guilt, and the effect of specific corrective instructions of the trial court, if any, against the weight of the evidence of appellant's guilt.

*Bowman,* 652 A.2d at 70 (citations omitted). Finally, where a defendant has properly preserved his objection on the record, this court must make a determination as to

> whether we can say with fair assurance, after all that has happened without stripping the erroneous action from the

12. *See* D.C.Code § 22–901.

whole, that the judgment was not substantially swayed by the error.

*Irick*, 565 A.2d at 32 (citations omitted). However, where as here, defendant has not properly preserved his objection, this court "will reverse his conviction only if the misconduct so clearly prejudiced his substantial rights as to jeopardize the fairness and integrity of his trial." *Id.* (citations omitted); *see also Bowman*, 652 A.2d at 71. The question is "'whether the judge abused his discretion by failing to intervene *sua sponte* in the prosecutor's argument.'" *Parker v. United States*, 757 A.2d 1280, 1289 (D.C.2000) (quoting *Mills v. United States*, 599 A.2d 775, 787 (D.C. 1991)). "[R]eversal for plain error in cases of alleged prosecutorial misconduct should be confined to 'particularly egregious' situations." *Id.* (citing *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)); *see also Bowman*, 652 A.2d at 71. This is not such a case. Assuming an impropriety in the prosecutor's comments, in light of the overwhelming evidence of guilt, it is not likely that this brief statement infected the verdict.

## VI. *Sentencing Challenge*

Appellant argues that the trial court erred in imposing an enhanced sentence pursuant to D.C.Code § 23–1328 (1996 Repl.) without providing him "with the opportunity mandated by opinions of this Court to affirm or deny the allegations underlying the enhancement request."[13] He also contends that "the sentencing judge erred in failing to require the government to introduce actual proof that [he] was, in fact, on release at the time he

allegedly committed the offenses for which he was convicted."

■■■ Appellant relies primarily on *Tansimore v. United States*, 355 A.2d 799 (D.C.1976). In *Tansimore*, the prosecutor sought to have the appellant's sentence enhanced. During the sentencing hearing, the trial court asked the appellant whether he had previously been convicted of petit larceny. In response to the appellant's refusal to respond, the trial court sentenced him under the release offender statute, treating the appellant's silence as an admission. The government was not required to prove that the appellant had been on release during the commission of newly convicted offenses. *Id.* at 801. On appeal, the appellant argued that "the sentencing judge erred by failing to require the government to introduce actual proof that appellant was, in fact, on release at the time he committed the offenses for which he was convicted." *Id.* at 803. In reversing the sentence imposed under the release offender statute, this court ruled that it was error to enhance appellant's sentence "in the absence of an admission or proof that he was, in fact, on release during the commission of the offenses for which he was convicted." *Id.* at 804. In addition, this court ruled that the trial court erred in treating appellant's silence as an admission of his release status without requiring the government "to introduce any proof either of the fact of release or of the identity of appellant as the release offender." *Id.* In contrast to the facts in *Tansimore*, appellant's trial counsel admitted to the release status of appel-

---

**13.** D.C.Code § 23–1328 reads as follows:

(a) Any person convicted of an offense committed while released pursuant to section 23–1321 shall be subject to the following penalties in addition to any other applicable penalties:

(1) A term of imprisonment of not less than one year and not more than five years if convicted of committing a felony while so released; and

(2) A term of imprisonment of not less than ninety days and not more than 180 days if convicted of committing a misdemeanor while so released.

(b) The giving of a warning to the person when released of the penalties imposed by this section shall not be a prerequisite to the application of this section.

(c) Any term of imprisonment imposed pursuant to this section shall be consecutive to any other sentence of imprisonment.

lant during sentencing by electing not to challenge the government's proffer.[14]

Appellant also cites to *Logan v. United States*, 591 A.2d 850 (D.C.1991). In *Logan*, the statute under which sentence was imposed, D.C.Code § 23–111(b) (1996 Repl.), required the court to address the defendant directly before pronouncement of sentence to determine "whether he affirms or denies the ... information." D.C.Code § 23–111(b). This court held that under that statute, "the judge must afford the defendant the opportunity to affirm or deny any alleged past convictions and inform the defendant that the failure to challenge a past conviction prior to sentencing will result in the waiver of any right to such a challenge in the future." *Logan*, 591 A.2d at 852 (citation omitted). The statute under which Edwards was sentenced does not contain a comparable provision. Indeed, "[t]he giving of a warning to the person when released of the penalties imposed by this section shall not be a prerequisite to the application of this section." D.C.Code § 23–1328(b).

For the foregoing reasons, the judgment appealed from hereby is

*Affirmed.*

---

14. The following exchange took place during the sentencing hearing:

COURT: Mr. Delgado, [the government] has indicated there are enhancement papers in this case. I don't recollect enhancement papers.

GOVERNMENT: They were filed last spring, Your Honor, back around March, at the second status hearing.

COURT: They are unchallenged?

GOVERNMENT: He was on release in the misdemeanor case for which he's since been sentenced.

COURT: They are unchallenged?

DEFENSE: Yes.

COURT: So all of these are by half enhanceable?

DEFENSE: Yes, Your Honor.

GOVERNMENT: It's my understanding of the statute—and I can check this—but the Court can add up to 5 years onto the sentence as a whole, I believe, but they were filed on March 13th. I have a copy here.

COURT: But they are unchallenged?

GOVERNMENT: They were unchallenged at the time, Your Honor.

COURT: And they remain unchallenged. . . .